**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 1, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2026AP865**

Cir. Ct. No. 2024TP249

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.V.L., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

G.L.,

      RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: LAURA GRAMLING PEREZ, Judge. *Affirmed.*

¶1 DONALD, C.J.[1] Gwen appeals from an order terminating her parental rights to her daughter, Annie.[2] Gwen contends that the circuit court erred when it found that the State had proven, by clear and convincing evidence, that the Division of Milwaukee Child Welfare (DMCW)[3] made a reasonable effort to provide her with court-ordered services. Gwen also argues that the termination order should be vacated because DMCW did not comply with the Americans with Disabilities Act (ADA). For the following reasons, we affirm the circuit court's order.

## BACKGROUND

¶2 Gwen gave birth to Annie on May 11, 2021. Hospital employees believed that Gwen was unable to take care of Annie and Gwen agreed for Annie to be discharged to Gwen's sister, who became Annie's legal guardian. DMCW first became involved when Annie was around two-and-a-half years old, after receiving a report that Annie's legal guardian[4] was no longer willing to care for her and had left Annie with a cousin. DMCW was also informed that Annie was autistic and that Gwen was intellectually disabled, had mental health issues, and was unable to take care of Annie. Annie was placed in foster care and the State filed a petition alleging that Annie was a child in need of protection or services (CHIPS) on October 5, 2023. ]

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] We refer to the family in this matter by initials or pseudonyms to maintain confidentiality and privacy, in accordance with WIS. STAT. RULE 809.19(1)(g).

[3] Formerly known as the Division of Milwaukee Child Protective Services (DMCPS).

[4] The circuit court subsequently allowed Annie's legal guardian to resign.

¶3     Although Gwen had never been Annie's primary caregiver, Gwen wanted Annie to be placed with her.  The ongoing case manager testified that, prior to filing the proposed CHIPS dispositional order, DMCW collaborated with the assistant district attorney and Gwen's attorney (who consulted with Gwen) to identify what services would benefit Gwen and assist her in working toward reunification.  DMCW had concerns about Gwen's mental health and possible cognitive delays and therefore recommended a psychological evaluation in order to learn how to best support her.

¶4     A CHIPS dispositional order was entered on June 26, 2024, which set forth the conditions Gwen would need to meet for Annie to be under her care.  The order also required DMCW to provide the following services to Gwen: (1) a psychological evaluation of Gwen and follow all recommendations; (2) a parenting assessment of Gwen and follow all recommendations; (3) parenting education; (4) set up a visitation plan for Gwen to visit Annie and provide Gwen with bus tickets as needed; and (5) obtain reports from Gwen's and Annie's therapists to monitor their progress.  The order further required DMCW to obtain an autism evaluation for Annie.[5]

*DMCW Arranges for Gwen's Psychological Evaluation and Offers Recommended Therapy*

¶5     As required by the order, DMCW arranged for a psychological evaluation of Gwen.  A licensed psychologist assessed Gwen's cognitive ability, personality traits, and stress level as a parent, and diagnosed her with "Intellectual

---

[5] Annie was evaluated and diagnosed as autistic.  At the time of trial, Annie was four years old, non-verbal, and not toilet trained.  She was receiving intensive autism services, including around thirty hours of applied behavioral therapy per week, and occupational therapy every other week.

Disability, mild" and "Bipolar II Disorder, current episode depressed." The cognitive evaluation measured Gwen's overall intellectual ability as "within the extremely low range," and concluded that she would have difficulty "learning and retaining new information." The personality assessment found that she had an "intense mistrust of others"; "a low tolerance for frustration and may be irritable or impatient when things don't go her way"; difficulty accepting others' viewpoints; and a history of "hypomanic episodes." The parenting stress assessment concluded that Gwen was experiencing more stress than the average parent, and that she "appear[ed] to feel overwhelmed by the demands of the role of the parent and lack[ed] a sense of competence as to how to manage [Annie]."

¶6      The psychologist also noted that Gwen had been experiencing mood instability, including depression and anxiety, since childhood, and had not participated in mental health treatment consistently enough to improve, concluding that Gwen "has personal obstacles that could interfere with her ability to be consistent in her parenting." The psychologist recommended that Gwen participate in individual therapy and parent-child therapy with Annie.

¶7      The ongoing case manager testified that she discussed the recommended therapy with Gwen on multiple occasions, and had even begun discussing therapy with Gwen before the psychological evaluation, but Gwen was unwilling to participate. At trial, Gwen claimed that she found her own therapist and had been participating in individual therapy, but didn't tell her case manager about it. Gwen also testified that she was amenable to family therapy but that DMCW did not give her a therapist. The case manager further testified that Gwen refused to provide complete medical information about any prior diagnoses, whether she was taking any medications, or whether she had a psychiatrist.

*DMCW Conducts a Parenting Assessment and Provides Parenting Education,*
*Including Extra One-On-One Support*

¶8      The ongoing case manager testified that DMCW discussed and offered parenting services to Gwen, including a parenting assessment and parenting education. A parenting assessment was performed and DMCW referred Gwen to a group-based parenting class offered by their provider at Children's Hospital. Gwen completed the course. Gwen was then observed at visits with Annie to determine whether her parenting skills were improving. Upon observing that Gwen struggled to understand and apply the skills from the parenting course, DMCW provided a one-on-one parenting aide. The case manager testified that the aide was supposed to meet with Gwen in-person but Gwen wouldn't allow the aide inside her home, so they had weekly phone conversations instead. Gwen testified that she would have let the aide come to her house but that he told her he didn't have time to visit her in-person. At the time of trial, the aide had been working with Gwen for eight to nine months, and would talk to Gwen about how to engage with a child like Annie, who was autistic and non-verbal.

*DMCW Sets Up a Visitation Plan*

¶9      The ongoing case manager testified that Gwen was on a regular visitation schedule of four hours per week, and that the visits were supervised. Gwen was made aware that DMCW could provide bus tickets if she needed them. Gwen regularly attended visits but struggled to interact with and engage Annie. The case manager reported that during visits, Gwen was often sitting on the couch, using her phone to engage with Annie instead of getting up and playing with her. The visitation worker provided parenting guidance to Gwen, including strategies for keeping Annie calm during a diaper change and encouraging Gwen to bring Annie healthy snack food instead of chips and candy. The visitation worker also

encouraged Gwen to take Annie outside because Annie loved the outdoors, but Gwen refused.

*DMCW Makes Additional Individualized Accommodations for Gwen*

¶10    Understanding that Gwen had cognitive impairment, the ongoing case manager devoted extra time to her case, contacting Gwen more often and repeatedly explaining the requirements for reunification.  The case manager also regularly reminded Gwen of appointments and therapy opportunities, and invited her to participate in Annie's treatment.  Gwen was repeatedly invited to attend Annie's autism therapy and the monthly meeting in order to get a better understanding of Annie's needs and how to interact with her, but she declined. They also offered the monthly meeting via Zoom because they knew it would be difficult for Gwen to attend in person.

¶11    On December 26, 2024, the TPR petition was filed on the ground of continuing CHIPS, alleging the Gwen had failed to meet the conditions of safe return.  At trial, the jury found that DMCW made reasonable efforts to provide the court-ordered services, that Gwen failed to meet the conditions for Annie's safe return, and that there was no substantial likelihood that Gwen would meet those conditions by September 26, 2025 (the date on which Annie will have been placed outside the home for fifteen of the last twenty-two months).  At the dispositional hearing, the court found that termination was in Annie's best interest, and therefore terminated Gwen's parental rights by order dated August 29, 2025. Additional facts will be discussed as needed.

## STANDARD OF REVIEW

¶12 "When parents contest termination of their parental rights, the termination proceeding involves a two-step procedure—a factual finding of grounds for termination and a legal conclusion that termination is in the best interests of the child." *Sheboygan Cnty. DHHS v. Tanya M.B.*, 2010 WI 55, ¶51, 325 Wis. 2d 524, 785 N.W.2d 369. Under WIS. STAT. § 48.415(2), continuing CHIPS constitutes grounds for an involuntary termination of parental rights. The State has the burden to prove, by clear and convincing evidence, all elements of continuing CHIPS. *St. Croix Cnty. DHHS v. Michael D.*, 2016 WI 35, ¶28, 368 Wis. 2d 170, 880 N.W.2d 107.

¶13 Whether the evidence is sufficient is a question of law that we review de novo. *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶17, 333 Wis. 2d 273, 797 N.W.2d 854. The jury's verdict "must be sustained if there is any credible evidence, when viewed in a light most favorable to the verdict, to support it." *Tanya M.B.*, 325 Wis. 2d 524, ¶49. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2). "It is for the [circuit] court, not the appellate court, to resolve conflicts in the testimony." *Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶19, 301 Wis. 2d 752, 734 N.W.2d 169.

## DISCUSSION

I.   **The circuit court did not err when it found that the State proved by clear and convincing evidence that DMCW made a "reasonable effort" to provide court-ordered services.**

¶14 Gwen argues that the State did not prove one element of continuing CHIPS: that DMCW made a reasonable effort to provide her with court-ordered

services.  "Reasonable effort" is defined as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent, … the level of cooperation of the parent … and other relevant circumstances of the case."  WIS. STAT. § 48.415(2)(a)2.  Specifically, Gwen contends that the State failed to meet its burden because its provision of services did not sufficiently take into account her intellectual disability.  We disagree and conclude that there is ample "credible evidence" that the State made reasonable efforts to provide court-ordered services to Gwen.

¶15     Beginning with the parenting assessment, the ongoing case manager testified that it consisted of a series of questions "surrounding around parenting," which the parent answers.  Gwen argues that the assessment was not sufficient because it was the "same parenting assessment that the Department gives to all parents."  But the fact that it was the same does not mean that it was insufficient.  Indeed, there was evidence from the psychologist that Gwen was able to engage in conversation, answer questions, and complete assessments.  Moreover, DMCW did not rely solely on the formal parenting assessment to evaluate Gwen's parenting skills.  The case manager testified that Gwen's parenting was assessed continually throughout the case by observing her at visits with Annie.  Taken together, this is credible evidence that DMCW made a reasonable and appropriately individualized effort to assess Gwen's parenting ability.

¶16     Gwen also argues that the parenting services provided were deficient because they did not do more to "address [Gwen's] refusal to allow the parent aide in[to] her home."  Gwen asserts that DMCW should have "asked [Gwen] why she would not let the aide in her home" and facilitated in-person meetings between Gwen and the parenting aide at a different location.  While it is true that DMCW

could have attempted to do more, that is not the standard. *See Waukesha Cnty. DHHS v. Teodoro E.*, 2008 WI App 16, ¶24, 307 Wis. 2d 372, 745 N.W.2d 701 (evidence showed department provided numerous services to parent; the fact that the department could have done more did not render its effort unreasonable). The jury received evidence that DMCW arranged for a group-based parenting class, and when it was apparent that Gwen needed extra help, she was provided a personal aide to help her implement what she had learned in class. We conclude that this constitutes credible evidence supporting the jury's verdict that DMCW made a reasonable effort to provide parenting education to Gwen.

¶17    Gwen further argues that DMCW made "nominal efforts to engage [her] in individual therapy," and therefore did not follow the recommendations in the psychological evaluation. According to Gwen, repeatedly discussing therapy with her was not enough, though she does not identify any alternatives or additional steps DMCW could or should have taken to persuade Gwen to agree to therapy. The ongoing case manager testified that, over a period of many months, both before and after the psychological evaluation, she repeatedly discussed therapy with Gwen and that Gwen steadfastly refused to participate. Our supreme court has emphasized that the parent's lack of cooperation is relevant to determining whether the state's effort was reasonable. *See Tanya M.B.*, 325 Wis. 2d 524, ¶74 (court found sufficient evidence to support jury's verdict that department's efforts to provide drug and alcohol treatment were reasonable, particularly because parents were "especially uncooperative"); *State v. Raymond C.*, 187 Wis. 2d 10, 16-17, 522 N.W.2d 243 (Ct. App. 1994) (court found state's efforts to provide services to developmentally disabled parent were reasonable where much of state's inability to facilitate services was due to parent's failure to keep appointments and update the county with current contact information).

9

While Gwen disputed her unwillingness to participate in therapy, the jury was entitled to make its own credibility determinations, and its conclusions were not "clearly erroneous." *See* WIS. STAT. § 805.17(2). We conclude that there is credible evidence that DMCW made a reasonable effort to provide Gwen with therapy.

**II. Gwen waived her ADA arguments, and even if she had not, they are barred by Wisconsin law.**

¶18 Gwen devotes much of her lengthy appellate brief to the history and development of the ADA and makes multiple arguments relating to its requirements and purported application to TPR proceedings. These ADA-related arguments fail for several reasons.

¶19 First, Gwen waived her ADA arguments by not raising them in the circuit court. "It is a fundamental principle of appellate review that issues must be preserved at the circuit court." *State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727. "The waiver rule is not merely a technicality or a rule of convenience; it is an essential principle of the orderly administration of justice." *Id.*, ¶11.

> The waiver rule serves several important objectives. Raising issues at the trial court level allows the trial court to correct or avoid the alleged error in the first place, eliminating the need for appeal. It also gives both parties and the trial judge notice of the issue and a fair opportunity to address the objection. Furthermore, the waiver rule encourages attorneys to diligently prepare for and conduct trials. Finally, the rule prevents attorneys from "sandbagging" errors, or failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal. For all of these reasons, the waiver rule is essential to the efficient and fair conduct of our adversary system of justice.

*Id.*, ¶12 (citations omitted).

10

¶20     Gwen bears the burden of showing that her ADA arguments were raised before the circuit court.  *See id.*, ¶10.  She admits that the ADA was never referred to "by name," but argues that her attorney "consistently invoked the abiding principles of the ADA, both in cross-examination and in closing argument" and that "[i]t was the [c]ourt's job to make that connection."  But we do not require the circuit court to read Gwen's attorney's mind or make Gwen's argument for her.  It is undisputed that the ADA was never even mentioned, and that its applicability to the TPR proceedings was never argued or briefed before the circuit court.  As such, neither the State nor the circuit court had the opportunity to address the issue and we conclude that Gwen's arguments relating to the ADA have been waived.

¶21     Second, even if Gwen had not waived her ADA arguments, Wisconsin law holds that the ADA does not define or increase the duties of child welfare agencies to provide court-ordered services, and is not a defense to TPR proceedings.  *See Raymond C.*, 187 Wis. 2d at 12, 15.  Gwen argues that *Raymond C.* must be "explicitly overrule[d]," and that, "to comport with federal law," Wisconsin courts must adopt the holding of the Michigan Supreme Court in *In Re Hicks/Brown*, 893 N.W.2d 637, 640 (Mich. 2017) (holding that "efforts at reunification cannot be reasonable under the Probate Code if the Department has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA").  But we do not have the authority to overrule *Raymond C.  See Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) ("only the supreme court, the highest court in the state, has the power to overrule … a published opinion of the court of appeals").  We also note that in *Hicks/Brown*, prior to trial, the parent's attorney repeatedly asked for more individualized services to accommodate the parent's intellectual disability and the

requested services were never provided. *Hicks/Brown*, 893 N.W.2d at 638-39. No such facts have been alleged here.

### III. Gwen's remaining claims are grounded in already-rejected arguments.

¶22 Finally, Gwen contends that termination of her parental rights was improper because: (1) DMCW "did not make an individualized assessment of [her] as a placement option contrary to the ADA"; (2) the termination proceedings were inappropriately "fast-track[ed]"; (3) the circuit court erred in denying her motion for judgment notwithstanding the verdict; and (4) the jury instructions should have been modified to "comport with the ADA". All of these arguments are, at least in part, grounded in alleged violations of the ADA. To the extent that they go beyond the ADA, they merely reiterate Gwen's claim that DMCW failed to make a reasonable effort to provide her with court-ordered services. We have already rejected these arguments and will not address them further.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.